IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, *ex rel.*,<br>PAUL KANARIS<br>3535 S. Ball Street #316<br>Arlington, VA 22022<br><br>Plaintiff-Relator,<br><br>BRINGING THIS ACTION ON BEHALF<br>OF THE UNITED STATES OF AMERICA<br><br>and<br><br>UNITED STATES ATTORNEY FOR<br>THE DISTRITCT OF COLUMBIA<br>Judiciary Center Building,<br>555 Fourth Street, NW,<br>Washington, 20530<br><br>and<br><br>ATTORNEY GENERAL OF THE<br>UNITED STATES<br>U.S. DEPARTMENT OF JUSTICE<br>950 PENNSYLVANIA AVENUE, N.W.<br>Washington, DC 20530<br><br>vs.<br><br>DKW COMMUNICATIONS INC.<br>8701 Georgia Avenue, Suite 809<br>Silver Spring, MD 20010<br><br>Defendants. | CASE NO.: _____<br><br><br>**COMPLAINT**<br><br>FILED **UNDER SEAL** PURSUANT<br>TO   31 U.S.C. § 3730(b)(2)<br><br><br>**JURY TRIAL DEMANDED** |

Plaintiff-Relator Paul Kanaris brings this action under the *qui tam* provisions of

the False Claims Act 31 U.S.C. §§ 3729, *et seq.* in the name of the United States of

America and himself, to recover damages and civil penalties from Defendant DKW

1

Communications Inc. ("DKW"). The Plaintiff-Relator confronted DKW's management with problems he observed regarding services it had contracted with the United States Department of Agriculture, Food Safety and Inspection Service to provide. Instead of addressing any of these issues, DKW fraudulently covered up its failure to perform, obtained additional purchase order awards by concealing its failure to perform, and charged for work on new purchase orders to fix issues it was obligated to address on the first purchase order. DKW thereby presented false claims and created false records to obtain federal funds in violation of the Federal False Claims Act, 31 U.S.C. §§ 3729(a)(1) and (2). In addition, shortly after the Plaintiff-Relator confronted DKW management about these issues he was terminated. Plaintiff also seeks to recover damages on behalf himself individually under the False Claims Act, 31 U.S.C. § 3730(h).

## JURISDICTION AND VENUE

1. This action arises under the False Claims Act, 31 U.S.C. §§ 3729 *et seq.* This Court maintains jurisdiction over this action pursuant to 31 U.S.C. § 3732(a), 28 U.S.C. § 1331 and 28 U.S.C. § 1345..

2. Venue is proper in this Court pursuant to 31 U.S.C. § 3732(a) because DKW regularly transacts business in this District and did so at all times relevant to this Complaint. Further, DKW committed the acts proscribed by the False Claims Act within this District.

3. There has been no public disclosure of the allegations contained herein.

4. Plaintiff-Relator is the original source of the information contained in this Complaint within the meaning of 31 U.S.C. § 3730(e)(4)(B). Plaintiff-Relator has direct and independent knowledge of the information contained herein and has

voluntarily provided the information on which the Plaintiff-Relator's allegations are based to the United States government before filing this action.

## PARTIES

5.  Plaintiff-Relator Paul Kanaris, formerly known as Brian Washburn, of 3535 S. Ball Street #316 Arlington, VA 22022 is an ISTQB-Certified Quality Assurance Engineer, with more than ten years of experience in executing cost-effective, re-usable, robust, data driven software validation and verification solutions. He worked for the Defendant DKW as a Senior Quality Assurance Engineer, and as Test Manager of Quality Assurance from August 2010 through December 2010. The Plaintiff-Relator legally changed his name to Paul Kanaris for religious reasons to reflect his faith in 2012.

6.  Defendant DKW Communications, Inc., Hereafter "DKW" of 8701 Georgia Avenue Suite 809 Silver Spring MD, 20910 is an information technology contractor to various federal government agencies.

## FACTUAL ALLEGATIONS

## I.  INTRODUCTION

7.  The allegations contained in the preceding paragraphs are hereby re-alleged and set forth fully as above.

8.  Defendant DKW obtained purchase order contracts for work under the General Services Administration ("GSA") Contract Number GS-35F-0704N. This Contract was issued under GSA Schedule 70 SIN 132-51 for information technology (IT) professional services. This GSA contract is as an indefinite quantity, indefinite delivery contract vehicle.

9.     DKW was awarded at least three purchase orders under the GSA contract, AG3A94P090167, AG3A94P100097, and AG3A94P100157, through which it obtained funds from the United States by committing violations of the Federal False Claims Act.

10.    These purchase orders are Firm Fixed Price contracts under the terms of the Contract GS-35F-0704N.  Additional purchase orders were obtained to increase the scope of DKW's work and increase its authority to bill the Department of Agriculture and are also implicated by DKW's fraudulent conduct in an amount to be determined at trial.

11.    On or about September 17, 2009, DKW obtained a $2.1 million purchase order number AG3A94P090167, (hereinafter referred to as the "PACS Contract"). Through this purchase order DKW contracted with the United States Department of Agriculture to develop a security system for the Food Safety and Inspection Service ("FSIS") of the United States Department of Agriculture ("USDA").  This security program was known as the "PHHRS [Public Health Human Resources System] Automated Classification System" or ("PACS").

12.    On or about June 15, 2010, DKW obtained purchase order number AG3A94P100097 from the FSIS for $2.8 million.  Under this second purchase order, DKW was supposed to perform Independent Verification and Validation ("IV&V") on the Public Health Information System ("PHIS") being developed by Science Applications International Company ("SAIC") for the FSIS. Hereafter this purchase order contract is referred to as the "IV&V Contract."

13. The PHIS program was designed to permit FSIS inspectors throughout the United States to enter reports of their inspections into a central database. The PHIS program also incorporated DKW's product PACS.

14. DKW obtained this IV&V purchase order as a result of its efforts to conceal problems with PACS.

15. On or about September 14, 2010, the FSIS awarded DKW purchase order number AG3A94P100157 for $3.5 million, to fix the supposedly defective Public Health Information System program, hereafter referred to as "PHIS Contract."

16. DKW knowingly made false statements to the United States about the PHIS program to induce the United States to award DKW a contract to fix it.

17. In fact, the fundamental flaw with the PHIS program lay with DKW's own PACS product and DKW knowingly made false statements to and concealed those flaws from the Government.

18. DKW charged the United States as if it performed properly under its September 2009 PACS purchase order contract, thereby making false claims and false statements. Then DKW charged the United States to fix its own mistakes under later contracts.

19. The PACS program was based on fundamentally flawed architecture that did not conform to any accepted standards for Enterprise Project Management programs.

20. DKW also failed to perform the Independent Verification and Validation as required by the purchase order it was awarded.

21. DKW constantly did not load and otherwise did not execute key portions of the PHIS program, causing numerous errors that had nothing to do with the quality of

the software.  Rather than attempt to correct its failings and do proper verification and validation, DKW instead classified the problems as software/programming defects by SAIC, including those problems DKW knew were due to user error. DKW knowingly memorialized these false classifications in daily reports to the FSIS, which it submitted to create the illusion that it was performing on the IV&V contract.

22.   DKW made additional false statements by reporting that it had resolved errors, even though it had not done any work because the errors it did report did not exist.

23.   Based on these false reports, DKW then knowingly made false statements to the FSIS that SAIC had created an unworkable program.

24.   While the PHIS program was, in fact, most likely unworkable it was not as a result of any fault of SAIC.

25.   Many issues that DKW did identify as defects in the PHIS program were due to user-error by DKW.

26.   The true problem with the PHIS program was created by the part of the project that DKW itself was responsible to create, namely the PACS.

27.   Unbeknownst to the government and to SAIC, the Defendant DKW based its product PACS on catastrophically flawed architecture that was so inefficient and resource-intensive that it made the entire PHIS program incapable of supporting the required number of users.

28. DKW knew that PACS was fundamentally flawed, but continuously represented to the FSIS that the problems with the PHIS program lay with SAIC's programming.

29. It was because of the false representations that DKW officials made about the viability of PACS that the FSIS decided to hire DKW to perform independent verification and validation in the first place. Had the FSIS known that PACS was a fundamentally unusable program, it would not have granted DKW the $2.8 million IV&V purchase order. Indeed, DKW could not have provided independent verification and validation services on its own product and yet it was its own PACS product, which was making the PHIS program unworkable.

30. Similarly, the FSIS' decision to award DKW a $3.5 million contract to fix the PHIS program was based on DKW's false statements that the problems with PHIS were not its own fault.

31. DKW failed to perform on the $2.1 million to develop PACS, used the $2.8 million IV&V Contract to cover up its failure to perform on the PACS Contract, then used the fake defects it created during performance of the IV&V Contract to convince the FSIS expand on that purchase order with the $3.5 million PHIS purchase order through which DKW charged the government to fix problems it had created during its failed performance on the previous contract.

32. Accordingly, DKW obtained the IV&V Contract and PHIS Contracts through fraudulent representations. DKW fraudulently induced the government to hire DKW to repair defects that either did not exist or were the result of its own poor

performance. All claims presented to the United States for work performed under the IV&V Contract and PHIS Contracts therefore were false claims.

33.     Similarly, each representation that DKW made as to the number of errors corrected were false statements material to such claims. DKW made these false statements to receive payment from the United States Government.

34.     In sum, the Defendant's fraudulent conduct includes, but is not limited to:

(1)     Fraudulently inducing the United States Government to award the IV&V and PHIS Contracts;
(2)     Making false certifications and statements to create the illusion of adequate performance under each Contract discussed herein;
(3)     Creating false records to obtain payment from the United States;
(4)     Submitting false claims for payment to the United States for work performed under each Contract, and billing for work that was not performed.

## II.   SUMMARY OF RELEVANT CONTRACTURAL REGULATIONS

35.     The allegations contained in the above paragraphs are hereby re-alleged as set forth fully above.

36.     The purchase orders discussed herein are subject to government regulations having been awarded pursuant to a General Services Administration contract.

37.     These regulations impose a legal duty on the Defendant, in addition to DKW's simple duty to present truthful records rather than falsifying records to obtain payments.

38.     For example, as firm fixed price contracts, the purchase orders discussed herein are subject to 48 C.F.R. § 52.246-4 of the Federal Acquisition Regulations ("FAR"), which provides:

The Contractor shall provide and maintain an inspection system acceptable to the Government covering the services under this contract. Complete records of all inspection work performed by the Contractor shall

be maintained and made available to the Government during contract performance and for as long afterwards as the contract requires."

*See* 48 C.F.R. § 52.246-4(b).

39.   These purchase orders are also subject to 48 C.F.R. § 46.105 of the FAR, which

provides:

   (a)   The contractor is responsible for carrying out its obligations under the contract by –

      (1)   Controlling the quality of supplies or services;
      (2)   Tendering to the Government for acceptance only those supplies or services that conform to the contract requirements;
      (3)   Ensuring that vendors or suppliers of raw materials, parts, components, subassemblies, etc., have an acceptable quality control system; and
      (4)   Maintaining substantiating evidence, when required by the contract, that the supplies or services conform to contract quality requirements, and furnishing such information to the government as required.

    \*\*\*

   (d)   The contractor is responsible for performing all inspections and test required by the contract except those specifically reserved for performance by the Government.

*See* 48 C.F.R. § 46.105

## III.   PACS PURCHASE ORDER FAILURES AND COVER-UP

40.   The allegations contained in the preceding paragraphs are hereby re-alleged and

set forth fully as above.

41.   On or about September 17, 2009, DKW obtained a $2.1 million purchase order

number AG3A94P090167 to develop a security and permissions system for the

Food Safety and Inspection Service ("FSIS") of the United States Department of

Agriculture.

42.   This security program was known as the "PHHRS [Public Health Human Resources System] Automated Classification System" and its acronym of ("PACS").

43.   The primary purpose of PACS was security. PACS was supposed to control what parts of the PHIS program a particular user could access.

44.   For at least some of the development work on this contract DKW hired Robert Jumblatt and his company Corebix. DKW retained responsibility for the PACS program.

45.   PACS relied on extremely inefficient architecture to control what a user could access.

46.   Rather than performing a single security check when the user logged in and then loading only those parts of the PHIS program that the user was authorized to access, PACS instead re-checked the user's authorization each time there was any attempt to perform an action.

47.   If a user attempted to click on a text field, PACS would check if the user had authorization to access that field. If a user attempted to enter data, PACS would check if the user had authorization to enter that data. If a user attempted to open a menu and scroll through menu options, PACS would check if the user had authorization to select each menu item.

48.   This extremely inefficient architecture exponentially increased the resources needed for something as simple as a mouse-click. It ensured that the PHIS program would never be able to handle more than a handful of users at a time.

49.  Chris Bowen who was the DKW quality assurance engineer for the PACS project had conducted some performance testing of the product prior to its release.  He and the Plaintiff-Relator discussed the fact that PACS was not able to perform as required.

50.  Mr. Bowen also had informed DKW's Project Manager Bill Chin of this issue.

51.  Mr. Bowen's concerns were not fixed by DKW management, but were hidden from the FSIS.

52.  In July 2010, DKW performed a large-scale user acceptance test, inviting FSIS inspectors to attempt to use the PHIS program.  This test showed PACS created a major problem for anyone to use the PHIS program.

53.  In fact, only ten users were able to use the PHIS program simultaneously, even though the specifications for the program required it to handle thousands of simultaneous users.  The users also reported more than 2,000 issues with the program.

54.  Near the end of August 2010, DKW performed another user acceptance test.  This test went no better than the one in July.

55.  DKW performed a third user acceptance test in early December 2010.  This time the program managed to accommodate about 120 users.  However, the primary reason for the improvement was that the users were permitted only a single script.  All of the users were doing the exact same thing.

56.  Even in this extremely simple case, with far fewer users than the product was supposed to accommodate, the program performed so poorly that it often took several seconds to perform a task as simple as selecting a menu.

57. This was not an accurate simulation of the capacity of the program. It was conducted to create the illusion that DKW's efforts had improved the program.

58. Plaintiff-Relator performed a detailed analysis of the December 2010 test and confirmed that the PHIS Program was unable to accommodate more users, because it was catastrophically inefficient. He was terminated shortly thereafter.

59. DKW knew that the PHIS program was required to support thousands of simultaneous users. DKW knew that the architecture on which PACS was built did not conform to standards for Enterprise Project Management programs and was so inefficient and resource-intensive that it would be impossible for the PHIS program to handle that many users.

60. However, DKW also knew that, because PACS was not designed as a stand-alone program, but rather as a subroutine intended to run within the PHIS program, it would be very difficult for the government to determine that PACS was flawed.

61. DKW's deception was complete. Indeed, the government did not know that PACS was catastrophically flawed, when it awarded DKW the prestigious FSIS Small Business Contractor of the Year (2010) ostensibly for the company's rapid completion of PACS.

## IV. THE INDEPENDENT VERIFICATION AND VALIDATION "IV&V" AND PUBLIC HEATH AND INFORMATION SYSTEM "PHIS" CONTRACTS

62. The allegations contained in the above paragraphs are hereby re-alleged as set forth fully above.

63. On or about June 15, 2010, the FSIS awarded DKW the $2.8 million Contract to perform Independent Verification and Validation on the Public Health Information System ("PHIS").

64.   The PHIS program was supposed to permit FSIS inspectors throughout the United States to enter reports of their inspections into a central database.   The PHIS program also incorporated PACS.

65.   DKW obtained this second purchase order as a result of the FSIS's belief that DKW had performed excellent work on the PACS contract.

66.   Initially, DKW referred all issues back to SAIC for resolution, but by September 14, 2010, DKW had convinced the Department of Agriculture that it needed to be directly involved in the resolution of defects, leading to the additional $3.5 million purchase order for DKW to handle the majority of the issues it discovered internally.

67.   DKW's primary task under the IV&V Contract was to conduct user acceptance testing.

68.   DKW was supposed to develop and run scenarios that would simulate the different ways that FSIS inspectors would use the PHIS program and note any issues that arose.

69.   When conducting user acceptance tests, DKW gave each user a "script" with step-by-step instructions on how to complete the particular scenario being tested, as well as an explanation of the expected outcome of each step.

70.   For example, a script might show the user a picture of the login screen and instruct him to enter the string "User1" into the "Login" field and the string "Test123" into the "Password" field and then press, "enter". The script then had a picture of the screen that was supposed to appear when these instructions were followed.

71.   If the result did not conform to what was predicted by the script, or if the user experienced any other type of problem, the user would report it to DKW as an "issue."

72.   DKW performed these tests with two different pools of people.

73.   First, its own employees were deployed to conduct small-scale tests of the PHIS program.  These users logged the issues they identified into a program called Footprints for tracking issues they discovered during the tests.

74.   Second, DKW conducted large-scale user acceptance tests of PHIS with actual FSIS inspectors.  These users logged the issues they identified into a program called Sharepoint, where it would later be imported into Footprints.

75.   Once a particular user acceptance test was complete, DKW was supposed to triage any issues that it discovered, attempt to duplicate the issues to verify their existence, make a preliminary determination about the root causes of those issues, and then either refer them for resolution by SAIC or resolve them internally.

76.   DKW was also required to track and monitor all issues until resolution.

77.   At each step, DKW was required to document its process for addressing each issue, recording what the issue was, who identified it, who verified its existence, what criteria were used to classify it, which team it was assigned to for resolution, how it was resolved, and all relevant dates.

78.   The FSIS required DKW to submit daily reports detailing progress made resolving any issues discovered during user acceptance tests.

79.   DKW submitted reports in the form of spreadsheets that contained the data stored in a program called Footprints.  These reports contained false information

designed to create the impression that DKW was successfully resolving issues when it was not.

80.    Plaintiff-Relator attempted to correct the false statements that DKW was making through these submissions, but was thwarted by DKW management.

81.    Plaintiff-Relator was hired in August 2010 to be a senior quality assurance engineer and promoted to assurance manager for the IV&V Contract soon after.

82.    In this capacity, he analyzed the issues that users identified and attempted to determine whether they were caused by problems with the software, or simple user error.   He also attempted to implement procedures to track issues from identification through resolution.   Such tracking was material to the purchase orders and DKW was required to maintain documentation demonstrating that it provided the services for which it charged.   *See* 48 C.F.R. § 52.246-4(b).

83.    Footprints, the program DKW used to track the resolution of issues, is not designed for this purpose.   Footprints is a flexible program that only tracks the particular information that it is configured to track.   If Footprints is not configured to keep track of code changes, it will not track code chances.   If it is not configured to track issue resolution, it will not track issue resolution.

84.    The most important step in tracking the resolution of an issue is documenting how that issue was resolved.

85.    For bug and enhancement issues, such documentation would necessarily include linking the issue to the particular code change that resolved it.

86.    Plaintiff-Relator quickly became aware that DKW Project Manager Bill Chin was hostile to tracking issue resolution properly. Mr. Chin took deliberate steps to

make sure that Footprints was configured to obscure the work that DKW was performing and omit any information that would show how or whether a particular issue got resolved.

87. In August 2010, shortly after starting his employment with DKW, Plaintiff-Relator attempted to reconfigure Footprints to fully document the resolution of each issue.

88. Mr. Chin, however, refused to allow Mr. Kanaris to record any information beyond the fact that the issue had been closed on a particular date.

89. For example, Plaintiff-Relator attempted to configure Footprints to require DKW employees to describe how an issue was resolved before it could be closed, but Mr. Chin immediately reversed this improvement to Footprints.

90. Plaintiff-Relator discovered the reason behind Mr. Chin's campaign to avoid tracking issue resolution.

91. In fact, most of the issues that DKW was claiming to resolve did not exist.

92. Mr. Chin was creating false records of work that DKW did not actually perform to create the impression that DKW was performing on the IV&V and PHIS Contracts. DKW was thereby able to receive payment for performance that DKW knew to be deficient.

93. Issues identified by the user acceptance tests were classified into several categories:

    a.    "Bugs" included all software-related issues with the functionality of the program. Correcting a bug required rewriting part of the program code.

    b.    "Enhancements" included issues that were not software defects per se, but that would improve the usability of the program.

Implementing an enhancement required rewriting part of the program code.

c. "Data Issues" referred to errors with the database being tested rather than the software itself, e.g. that the user could not access the database because the database had not been loaded as opposed to because the software did not work properly. Resolving a data issue required no rewriting of the program code.

d. "Documentation" referred to problems with the script that the user was given.

e. "Other" referred to all other issues. Resolving an "other" issue usually required no rewriting of the program code.

94. Mr. Chin had control of the issue-resolution process. Issues could only be entered, assigned, or resolved within the Footprints tracking system with his permission.

95. He also ensured that Footprints did not track who made any changes to Footprints, allowing him to make such changes without having to explain them.

96. As quality assurance manager, Plaintiff-Relator had access to all of the Footprints files and discovered that Mr. Chin was intentionally misclassifying issues as bugs or enhancements that actually should have been classified as data or documentation issues.

97. These issues were typically caused by DKW's own mistakes during user acceptance tests, such as failing to properly load a database for testing or creating a bad script.

98. Plaintiff-Relator also observed that Mr. Chin regularly closed issues on which no action had been taken.

99. In fact, during the period of August through November 2010, Mr. Chin closed more than half of the issues supposedly discovered by DKW without any corresponding software changes or even assignment to a team.

100.    It is, of course, impossible to fix a software issue without making changes to the software.

101.    In addition to misclassifying DKW's own data and scripting errors as software bugs, Mr. Chin attempted to create the illusion of progress by loading issues that had already been resolved.

102.    On or about August 26-28, 2010, Mr. Chin took the more than 2000 issues that had been discovered during the July 2010 user acceptance test and logged in the Sharepoint system, all of which had already been resolved, and then loaded them into Footprints as though they were new issues.

103.    Mr. Chin replaced the date that these issues were discovered with August 26, 27, or 28, the date that he entered it into Footprints.

104.    Mr. Chin then gradually closed each of these issues over the next two months to create the impression that DKW was performing under the IV&V Contract.

105.    On or about September 16 and 17, 2010, Mr. Chin took further steps to obscure the issue resolution process by changing assignments in DKW's team structure so as to make it impossible to determine the nature of an issue based on the team assigned to resolve it.

106.    Before this personnel reorganization, DKW teams were organized by type of issue. For example, the "Enhancement Team" dealt with enhancement issues, the "Data Team" handled database issues, the "Development Team" worked on software changes, and the "Test Automation Team" and "UAT/Test Team" concerned themselves with different aspects of testing.

107. After this reorganization, Mr. Chin organized DKW's teams into four "interdisciplinary" business teams that handled all types of issues for a particular type of food inspection: the "Business Team Domestic" handled issues related to the inspection of food produced domestically, while the "Business Team Export" and "Business Team Import" dealt with domestic food exported to other countries and foreign food imported from abroad respectively.

108. Finally, the "Business Team Lab/PA" worked on inspections at testing labs.

109. There was no legitimate business reason for reorganizing the teams in this way.

110. The processes for the Domestic, Export, Import, and Lab portions of the PHIS Program were not distinct. The only practical effect of the reorganization was to make it impossible to determine the nature of an issue by the team to which it was assigned. All types of issues were assigned to each team.

111. Reconfiguring DKW's team structure also helped obscure the fact that Mr. Chin was assigning tasks to individuals that were not qualified to perform them. In September 2010, after Plaintiff-Relator began raising concerns about DKW's failure to properly track issues, Mr. Chin assigned Anthony Quartieri to be the Relator's supervisor. Mr. Quartieri was a technical writer who had no education or training in quality assurance and was completely unqualified to supervise Mr. Kanaris or perform any quality assurance activities whatsoever.

112. Mr. Chin assigned similarly unqualified people to various other tasks. After the August 2010 team reorganization, Plaintiff-Relator learned that each member of each team worked on every type of issue, including quality assurance tasks that should only have been performed by Plaintiff-Relator.

113.   Mr. Chin also required all DKW employees to remove their job titles from the signature lines of their emails, which further confused the government and decreased the ability to trace attempts to resolve issues.

114.   This policy made it more difficult for the FSIS to determine each employee's responsibilities and concealed the fact that employees were performing work for which they were not qualified.

115.   Plaintiff-Relator documented Mr. Chin's fraudulent activities and brought them before DKW Vice President Dawn Winters.

116.   Plaintiff-Relator discussed some of these activities, particularly the need to properly track issue resolution, with Ms. Winters during a face-to-face meeting in mid-September, 2010.

117.   At the conclusion of that meeting, Ms. Winters promised to implement the Relator's recommendations.   However, Ms. Winters did not implement the Relator's recommendations and as a result Plaintiff-Relator began documenting his concerns.

118.   In mid-October, 2010, Plaintiff-Relator composed a memorandum detailing the many problems he witnessed at DKW.

119.   This document was prepared for his own reference and was not sent to any DKW employee.   In it Plaintiff-Relator described his concerns in numerical format a selection of which follows:

Overview of issue

2.   Perception and different communications have been made throughout this project. The perception is we are doing great. When reality came out 16% of fixed issues were returned, this did

not sit well with Bill. Bill states one thing to the team and another to the client, see test plan messages and risk.

3.　　Bill has spun his perception to the client and to DKW by misinformation, distortion of the facts, or though manipulation of data.

5.　　We have made changes twice to Footprints without Bill's or Anthony's approval. Both times this was met with displeasure at best and in all fact anger and frustration.

6.　　Bill is a project manager that is PMP certified but who is exceeding the roles and responsibility of the PM. He feels anyone is interchangeable and that he can make up roles as he desires.

7.　　Bill and the BAs since my arrival have stated the application does not work and needs to have serious code changes. This has supported the influx of developers who are determining after exhaustive time and effort, that many items do not need code changes

8.　　The BAs and Bill have consistently pointed out the failure of other teams and individuals while whitewashing their lack of Knowledge Skills and Ability on this project to understand the application and the issues reported.

11.　　Bill has stated that the USDA is not interested in testing, the reality is that the USDA needs this application to be validated which is why the hired DKW to do the IV&V

120.　　Plaintiff-Relator further described particular "Highlights" of these problems as follows in part:

1.　　Defects which we have hired a huge number of developers:

a.　　Steps to reproduce are not documented.
b.　　BAs blame everyone else to include triage team
c.　　Many issues are being found do not require any code changes.
d.　　BAs want the tester to figure out how the application works.
e.　　Solution: Have everyone fill in the detailed steps
f.　　Solution: Bring on tester with the KSA's to verify issues, create test procedures and assist in determining the root cause of the issue and help assign to the correct team.

    2.      Footprints

         a.      Admin rights have been removed
         b.      Anthony and Bill refused to do any of the changes
         c.      The changes are now being done that were suggested as Anthony's and Bill's Ideas
         d.      Solution: Have the tools managed by individuals who have the Knowledge Skills and Ability (KSA)

    3.      Test Management Tools

         a.      Jeremy [an FSIS employee] requested I meet with Sandra [another FSIS employee] to discuss the tools
         b.      I was to meet with Jeremey and follow up on the discussion
         c.      I must justify to Bill and Anthony what I am going to discuss with Jeremey
         d.      Solution: Tools are available but Bill does not want to use them
         e.      Solution: Implement the tools for manual test management

    4.      Performance Testing

         a.      We were not able to complete any performance testing due to system environment constraints.
         b.      The developers and dba's are highly concerned about the performance of the system.
         c.      The USDA is highly concerned about the system's performance.
         d.      Bill wants the envollment tool performance tested. USDA just wants to insure that 5 users can use the system.
         e.      PHIS is the primary concern for the team
         f.      Users can and will refuse to use even the best system if the performance is so poor as to adversely impact their work productivity.
         g.      Solution: The tools and environment have been provided by the USDA
         h.      Solution: Begin performance testing ASAP

121.   In the same document, Plaintiff-Relator described the impact of these problems on the PHIS project as a whole:

    1.      At risk that we are spending are resources for development which is being determined does not exist.

2.   At risk that the systems performance will not be acceptable since we are not making performance testing a priority.

3.   When the project goes to production it will not be SAIC that is held accountable for any major issues.

4.   We as DKW have not provided the USDA with a true assessment of the product for planning.

5.   The decision made by DKW will impact the delivery of this product and its subsequent outcome on the USDA delivery of quality products to our table.

6.   The success or failure of this project will have huge ramifications on the future of DKW.

122.   Plaintiff-Relator also communicated many of these concerns to Ms. Winters in writing.

123.   In one email to Ms. Winters about Mr. Chin's conduct, sent in late October 2010 with the subject "PHIS Project Concerns," Plaintiff-Relator stated the following:

I need to speak with you as soon as possible. I feel that the issues we need to discuss are not being resolved, and have a major impact on the project success or failure. Speaking to Bill has resulted in no solutions to the issues and he has displayed his intent to not listen and even defying all directions from the client and you.

***

Bill has stated that I will not be a manager until he says so. He has proven this by his action on Footprints by defying your request to remove Anthony as admin and implement the changes I suggested. He is openly letting the BAs have control of the testing team, and has now assigned me as the full time import/export tester reporting to Madhuri. All communications which should be handled between Bill and I are now being sent to the BAs and other individual to put me in my place. The process question is a major example of this.

***

I believe DKW's reputation is to do quality work and delivery quality products and services. The actions that are be taken on this project do not appear to meet those corporate guidelines as described on the home page by Darryl K. Washington, CEO and President. We also do not appear to be following the Quality Mgmt. to implement measurable process by following standards for CMMI Level 2 and Six Sigma DMAIC (Define-Measure-Analyze-Improve-Control).

The USDA wants software that works not a low defect count. Process resolves issues of a personnel nature and ambiguity. I want to support the effort on completing this project.

124.    In another email to Ms. Winters, sent at approximately the same time with the

subject "RE: Footprint changes," Plaintiff-Relator described a meeting with Mr.

Chin and Mr. Quartieri at which Mr. Chin and/or Mr. Quartieri made expressed

the following concerns:

We should not make changes just for QA [Quality Assurance]
We do not want the Government employees seeing something in Footprints that they will hold us accountable for such as builds, releases and dates. (That is why the Target Release and Due date fields on the new planning tab are hidden except to Admins and BAs)

We should not be concerned with Footprints or Test cases. This is going to go away when PHIS is deployed.

125.    In the same email, Plaintiff-Relator informed Ms. Winters that "Anthony and Bill

appear to want to hide information from the client instead of improving visibility

through the process to all stakeholders."

126.    In another email to Ms. Winters on November 15, 2010, Plaintiff-Relator stated as

follows:

At this time, however, I feel that I need to be more assertive in my position as DKW QA manager in order to ensure PHIS's and DKW's success from a QA perspective. I have come to this conclusion because in the past few weeks Bill has increasingly crossed the lines from a Project Manager to trying to act as Director of Development and gatekeeper. In doing so, he has created a fictional organizational world that does not match the organizational structure presented to the USDA or DKW's management structure. He has used this structure to act as the gatekeeper of information, micromanaged PHIS QA activities, and has failed to meet key QA project deliverables. Unfortunately, he has attempted to portray his failure as my failure to meet key deliverables. For example, he commits to Leonard in public meetings that I will work on the Test Plan, but, as soon as we leave the public meeting, he reassigns me to do testing

which has prevented me from working on the test plans. When Leonard asks for the test plans, Bill is not forthcoming with what he has done.

In another instance, the USDA scheduled a Risk Management meeting and requested that I participate in it to discuss project quality management. Twenty items were identified which required QA input. Bill, as is usual for him, acted as the "Lone Ranger" and ordered me not to attend the meeting because he planned to address these issues. Obviously, Bill does not have the knowledge, skills, or abilities to address QA issues. Yet, he typically presents himself as the expert and speaks to these issues and provides uninformed answers. The risk to DKW is that he is reporting inaccurate information, at best, to the USDA and making uninformed QA commitments. When the USDA's knowledgeable QA organization conducts an audit of PHIS QA project documentation, they will find discrepancies between what Bill said and what is actually in practice. Already USDA PHIS project management personnel have caught on to Bill's tendency to build "perceptions," and, when asked to deliver on these perceptions, has repeatedly failed to do so. USDA project management is increasingly demanding more detailed metrics.

I will be implementing the following solution to address these problems. I will take a more active and assertive role as DKW QA manager to ensure that PHIS complies with USDA and industry best practices and standards for QA. This is the best way that I can ensure that DKW delivers the quality and work it has committed to with respect to QA.

127.    Plaintiff-Relator was terminated three weeks after providing this information to

Ms. Winters via email.

128.    Under the Federal Acquisition Regulations, DKW was contractually required to

inspect its work and maintain accurate records so that the government would be

able to determine whether the IV&V and PHIS Contracts had been properly

performed. *See* 48 C.F.R. §§ 46.105(a)(4) and 52.246-4(b).

129.    DKW was further required to control the quality of its services and tender to the

government for acceptance only those services that conformed to the contract

requirements. *See* 48 C.F.R. §§ 46.105(a)(1), (2).   DKW not only failed to

perform these obligations, but also took steps to hide its true performance.

130. Rather than maintaining accurate records and tendering conforming services, DKW knowingly created false records and submitted false statements about the work it was performing and created the false impression that its own errors were the fault of SAIC, in order to obtain payments from the United States Government.

131. DKW's daily issue reports were false records, which created the false impression it was performing valuable services, when the majority of the supposedly resolved issues did not exist.

132. These statements were material to the United States' decision to pay DKW under the IV&V Contract as well as the PHIS Contract.

133. As a result, the claims DKW submitted for payment were false.

134. These claims were also false because each contained an implicit certification that DKW had performed services in conformity with the contracts, the governing regulations, and that the individuals who performed those services were qualified to do so. None of these certifications was true.

135. Finally, each claim for payment DKW presented was false because each of the Contracts had been fraudulently obtained. DKW obtained the IV&V Contract by fraudulently representing that it had properly performed the PACS Contract, when it knew that PACS contained unacceptable and fatal flaws.

136. DKW also obtained the PHIS Contract by falsely stating that the PHIS program contained significant defects that were the fault of SAIC.

137. In fact, DKW knew that the primary defect lay with its own work on PACS and the majority of the other issues it reported to the FSIS did not exist.

138. Had the FSIS known that the defects with the PHIS program were DKW's fault, the government would have been in a position to demand that DKW fix the program at no cost.

139. Instead, as a result of its fraudulent conduct, DKW was able to obtain additional contract work as a result.

## VIOLATIONS OF THE FEDERAL FALSE CLAIMS ACT

## COUNT I

## VIOLATIONS OF 31 U.S.C. § 3729(a)(1)(A) – PRESENTING FALSE CLAIMS

140. The allegations contained in the above paragraphs are hereby re-alleged as set forth fully above.

141. As described in this Complaint, Defendant DKW knowingly presented and/or caused to be presented, false and/or fraudulent claims for payment or approval by the United States Government.

142. DKW management knew that its PACS product was flawed but charged for services as if it was completed successfully. It concealed the true nature of its work from the U.S. Department of Agriculture's Food Safety Inspection Services.

143. Furthermore, DKW charged for services on two additional purchase orders, the IV&V purchase order and the PHIS purchase order, based on the premise that problems related to the PHIS program were not its fault.

144. DKW knowingly concealed the fact that the PACS architecture was the cause of the PHIS programs failures. It did so after a Quality Assurance official informed its Program Manger of the problem and it did so again when the Relator attempted to raise such issues with management.

145.   In doing so it obtained the subsequent two purchase orders and created work to bill the government, when in fact it was obligated to fix the PACS under the initial contract, not the PHIS contract and had no business obtaining either the PHIS or the IV&V purchase order work.

146.   DKW's work on these purchase orders also was in violation of the above-cited Federal Acquisition Regulations and claims it made for payment are implied certifications that its work conformed to such regulations.

147.   Such claims for payments also are certification that DKW was performing under these purchase orders. It was not.

148.   Through this course of conduct DKW has defrauded the United States and submitted false claims in violation of the False Claims Act, 31 U.S.C. §3729(a)(1)(A) in an amount to be determined at trial.

149.   DKW also created additional damages to the United States through its fraudulent conduct. Through concealing problems with its on PACS product it delayed and or damaged the work the government paid for which was conducted by another contractor SAIC. It also charged the United States for IV&V services while using U.S. Government FSIS employees to conduct fraudulent user acceptance testing, thereby interfering with the day to day running of an agency for no legitimate purpose.

150.   DKW is liable to the United States in an amount including but not limited to, three times the full value of all such fraudulent claims and additional damages caused by its fraudulent conduct.

151.    Each and every such fraudulent claim is also subject to a civil fine under the False Claims Act of five thousand five hundred dollars to eleven thousand dollars ($5,500 – $11,000).

**COUNT II**
**VIOLATIONS OF 31 U.S.C. § 3729 (a)(1)(B) – MATERIAL FALSE STATEMENTS OR RECORDS**

152.    The allegations contained in the above paragraphs are hereby re-alleged as set forth fully above.

153.    As explained above, DKW submitted reports to the Department of Agriculture Food Safety Inspection Services, which contained material false statements and certifications.

154.    The program manager for DKW created numerous reports for the express purpose of misleading the government about the work DKW was doing. He loaded false information on a tracking program to create the impression the defendant was performing services it was not performing.

155.    DKW also submitted progress reports with false information to the government. In addition, claims for payment themselves were false as they contained implied certifications that the company was comporting to applicable FAR's and was performing under the purchase order requirements.

156.    As such, the false statements and certifications that DKW made were material to the United States' decision to award the PHIS and IV&V purchase orders to DKW, as well as its decision to pay the claims that DKW presented under the PACS purchase order and under the PHIS and IV&V purchase orders.

157. By knowingly, willfully or recklessly making false statements and certifications material to the United States' decision to pay claims presented pursuant to these purchase orders, DKW has violated False Claims Act, 31 U.S.C. §3729(a)(1)(B).

158. As a direct and proximate result of DKW's fraudulent and/or illegal actions and pattern of fraudulent conduct, the United States has paid directly or indirectly numerous false claims and spent millions of dollars for services that it would not otherwise have paid.

159. DKW is liable to the United States in an amount, which includes, but is not limited to, three times the full value of all such fraudulent claims.

160. Each and every such false record is subject to a civil fine under the False Claims Act of five thousand five hundred to eleven thousand dollars ($5,500 – $11,000).

## COUNT III

**VIOLATIONS OF 31 U.S.C. § 3730(h) – RETALIATION AGAINST RELATOR**

161. The allegations contained in the above paragraphs are hereby re-alleged as set forth fully above.

162. As detailed above, Plaintiff attempted on numerous occasions to confront management with the failures inherent in its PACS product. He also attempted to confront management with the fact that the PACS product was undermining the effectiveness of the entire PHIS program. He specifically discussed these and other concerns with Dawn Winters and documented his concerns in emails to her.

163. Shortly after his December 2010 assessment of the PHIS, which demonstrated that the program could not perform its required tasks Plaintiff was summarily

terminated by Defendant.  Plaintiff's termination by Defendant was the result of Plaintiff's lawful acts in furtherance of an action under the FCA.

164.   As a direct and proximate result of DKW's discrimination and retaliation against Plaintiff for engaging in activities protected by 31 U.S.C. § 3730(h), Plaintiff has suffered damages in an amount to be determined at trial, including, but not limited to, actual damages, pecuniary damages and non-pecuniary damages. Defendant DKW is liable for damages including but not limited to, two times the amount of back-pay, interest on the back pay, special damages sustained as a result of the discrimination, reasonable attorneys' fees and litigation costs.  As a direct and proximate result of Defendant's actions, Plaintiff has suffered lost wages and benefits, lost reputation, loss of employment opportunities, embarrassment, humiliation, and mental and emotional distress and suffering.

165.   Plaintiff is also entitled to reinstatement and all relief necessary to make Plaintiff whole, including front pay and compensatory damages.

166.   Plaintiff's employment damages are continuing and ongoing.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff-Relator, on behalf of himself and the United States Government, prays as follows:

(a)   That this Court enter a judgment against DKW pursuant to Counts I and II in an amount equal to three times the amount of damages the United States has sustained, including but not limited to the full value of the FSIS Contract;

(c)   That the Court enter a judgment pursuant to Counts I and II and Defendant be held liable for a civil penalty not to exceed $10,000.00, as adjusted by the Federal

Civil Penalties Inflation Adjustment Act of 1990, for each and every violation of the False Claims Act described herein;

(d)   That Plaintiff-Relator and the United States be awarded all reasonable attorney fees and costs incurred, with interest, including expert witness fees, pursuant to Counts I and II;

(e)   That Plaintiff-Relator be awarded an amount that the Court decides is reasonable, which shall be not less than 15% nor more than 30% of the proceeds of the action or settlement of the claims or alternative remedies under the False Claims Act, 31 U.S.C. § 3730(c)(5), (d);

(f)   That Plaintiff-Relator be awarded an amount that the Court decides is reasonable, which shall be not less than 15% nor more than 30% of the proceeds or settlement of any related administrative, criminal, or civil actions, including the monetary value of any equitable relief, fines, restitution, or disgorgement to the United States and/or third parties;

(g)   That this Court enter an injunction debarring DKW from obtaining government contracts for an appropriate time;

(h)   That this Court enter a judgment pursuant to Count III in the amount of two times the back pay to Plaintiff from the date of termination to the judgment date, plus interest on any back pay awarded, and compensation for special damages sustained as a result of the discrimination suffered by Plaintiff;

(i)   That Plaintiff be awarded all special damages pursuant to Count III, and all damages available under 31 U.S.C. § 3730(h);

(j)  That Plaintiff-Relator and the United States be awarded pre-judgment interest on all monies awarded;

(k)  That Plaintiff-Relator be granted any and all preliminary and permanent injunctive relief, as appropriate;

(l)  That Plaintiff-Relator be awarded reasonable attorneys fees and litigation costs pursuant to all Counts;

(l)  That Plaintiff-Relator be granted any and all other relief set forth in the False Claims Act which was not specifically referenced above;

(m)  That Plaintiff-Relator be granted all other relief as the Court may deem just and proper.

Respectfully submitted,

*David K. Calap-t c/o @*

David K. Colapinto
D.C. Bar # 416390
KOHN, KOHN & COLAPINTO, LLP
3233 P Street, NW
Washington, DC 20007
(202) 342-6980 (Phone)
(202) 342-6984 (Fax)

- and -

Anthony C. Munter
D.C. Bar # 483823
PRICE BENOWITZ, LLP
409 7TH Street NW
Washington, DC 20004
(202) 417-6000 (Phone)
(202) 664-1331 (Fax)

*Attorneys for Plaintiff-Relator Paul Kanaris*

December 5, 2013